

# NUMBER 13-20-00350-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF BUMSTEAD FAMILY IRREVOCABLE TRUST

On appeal from the Probate Court No. 1
of Harris County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Benavides**

This appeal arises from a dispute between the trustee of several trusts, Taylor C. Moss, and the beneficiaries of those trusts, Taylor's mother, Carol Bumstead Moss, and Taylor's aunts, Debra M. Holzworth and Kathryn Marcotte (the beneficiaries).[1] After an

---

[1] This appeal was transferred to this Court from the Fourteenth Court of Appeals in Houston pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 22.220(a) (delineating the jurisdiction of appellate courts); *id.* § 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). The parties have not identified a conflict between the precedent of the Fourteenth Court of Appeals and that of this Court on any issues relevant to this appeal. *See* TEX. R. APP. P. 41.3. Because this is a transfer case, we apply the precedent of the Fourteenth Court of Appeals to the extent it differs from our own. *See id.* R. 41.

evidentiary hearing, the trial court issued an order on July 20, 2020, in favor of the beneficiaries which, *inter alia*, granted a temporary injunction, ordered an accounting, appointed a receiver, and suspended Taylor as the trustee of the trusts.

Appellants, including Taylor in his individual capacity; Taylor as Trustee of the TCM Trust, Bumstead Living Trust, Bumstead Family Trust, Bumstead Survivor's Trust, and Sylvia M. Bumstead Revocable Trust, and Manager of Wolf Trot Properties, LLC and Wolf Trot Properties, LLC d/b/a Melia Investments, LLC; DeisoMoss, LLC; and DeisoMoss Property Management, LLC, have appealed this order by three issues through which they assert that the trial court erred by: (1) using mechanisms for temporary relief to disrupt the status quo and decide the merits of the underlying causes of action without due process; (2) relying on findings contradicted by conclusive evidence and supported by no evidence; and (3) ordering Taylor to provide an accounting requiring information outside of his knowledge and funds outside of his control.

We affirm in part and reverse and remand in part.

## I.    INTRODUCTION

In summary, this case involves three generations of the Bumstead family. Richard C. and Sylvia M. Bumstead, possessing a substantial estate, created several trusts and various business entities to hold and manage their assets. Richard and Sylvia's primary real estate assets included: (1) a 15-acre tract of land located at 14200 West Hardy Road, Houston, Texas (the Hardy Road Property); (2) a two-hundred-acre tract of property located at 2435 Wolf Road, Huffman, Texas (the Homestead); and (3) a 1,437-acre tract of land located at 2435 Wolf Road, Huffman, Texas, excluding the Homestead (Wolf Road

Property).[2] The two main business entities that they created were Ridescka, Ltd. (Ridescka) and Wolf Trot Properties, LLC.[3]

Richard and Sylvia had three daughters: Debra, Kathryn, and Carol. Carol had two children: Taylor and Lindsay Moss. Richard passed away suddenly in 2012. As a result of his death, the structure and funding of the family's trusts changed. Taylor began assisting his grandmother Sylvia, who was in ill health, with the family properties. In 2013, Sylvia created the TCM Trust for Taylor and in 2014 allegedly transferred the Hardy Road Property to that trust. Neither Sylvia nor Taylor disclosed that transfer to Debra, Kathryn, or Carol. The beneficiaries dispute the validity of that transaction. When Taylor graduated from college in 2015, Taylor began residing with Sylvia at the Homestead. During this period, Sylvia and Taylor made several changes relative to the family trusts and entities which the beneficiaries allege were inconsistent with the terms of the family trusts and the foundational documentation for the family business entities. The beneficiaries were not involved in the decision-making processes or informed regarding the changes. Taylor began acting as trustee and managed the family's assets and businesses. In

---

[2] Based on our review of the record, the parties occasionally refer to the Homestead and the Wolf Road Property cumulatively as the "ranch."

[3] As will be evident, Wolf Trot Properties, LLC was a "series" LLC. According to the Texas Secretary of State:

> A series LLC, formed under Texas law, is an LLC that provides in its governing documents for the establishment of a series of members, managers, membership interests, or assets that have separate rights, obligations and liabilities and business purposes from the general LLC. Each individual series has the ability to sue and be sued, enter into contracts, hold title to assets, and grant liens or security interests in its assets.

TEX. SEC'Y OF STATE, *Formation of Texas Entities FAQs*, https://www.sos.state.tx.us/corp/formationfaqs.shtml#:~:text=A%20series%20LLC%2C%20formed%20under,purposes%20from%20the%20general%20LLC (last visited Jan. 25, 2022).

approximately 2019, the beneficiaries discovered that Sylvia had transferred the Hardy Road Property to Taylor's trust. In 2019, Sylvia passed away. The beneficiaries sought information from Taylor regarding the family's assets but were unsatisfied with his responses and became concerned about his management of the family properties. The beneficiaries requested Taylor to fund the trusts that resulted from Sylvia's death; however, Taylor refused to do so in the absence of a release of liability.

On November 13, 2019, Debra, Kathryn, and Carol filed suit against appellants.[4] They sought declaratory relief, an accounting, the imposition of a constructive trust, the removal of Taylor as alleged trustee, and temporary injunctive relief. They alleged causes of action for fraud, breach of fiduciary duty, negligence, undue influence, trespass, conversion, and money had and received. This pleading and its exhibits span more than seven hundred pages of the clerk's record. On February 21, 2020, the beneficiaries filed a first amended petition reiterating the foregoing causes of action and including, *inter alia*, causes of action for statutory fraud and the breach of the duty of full disclosure.

On December 23, 2019, the beneficiaries filed a "Motion to Remove Trustee and Appoint Receiver, and Alternatively, Motion to Require Non-Corporate Trustee to Post Bond." On January 6, 2020, they filed an amended version of that motion. On April 21, 2020, the beneficiaries filed a supplement to their amended motion to remove trustee and appoint receiver, and alternatively, motion to require non-corporate trustee to post bond, and their application for a temporary injunction.

---

[4] Debra, Kathryn, and Carol filed suit individually and as trustees of their Exempt Trusts, Descendants' Trusts, and the Bumstead Family Irrevocable Trust.

4

After appellants filed responsive pleadings, the trial court held hearings on these matters on May 4, 5, 11, 12, 13 and July 1, 2020. The trial court heard testimony from Kathryn; Taylor; attorney James C. Mulder, who worked with the Bumsteads on their legal affairs and estate planning for a span of twenty years; and attorney Mickey Davis, who assisted Sylvia and Taylor with estate planning matters thereafter.

On July 20, 2020, the trial court signed its "Order Suspending Powers of Trustee and Appointing Receiver." The order is thirty-one pages long and includes 180 separate enumerated paragraphs containing general findings, findings supporting interim relief, and findings supporting a probable right of recovery and probable imminent and irreparable harm.

The trial court concluded that Taylor failed to comply with his duty to disclose material facts; failed to comply with his duties to maintain trust and entity assets separately and not to co-mingle the assets of the various trusts, either with his own property or with other trusts or entities; "breached and/or may breach fiduciary duties"; provided inadequate, incomplete, and/or inaccurate accountings; breached his duty of self-dealing; breached his duty to account, and duty of loyalty. In short, the trial court assumed jurisdiction over the disputed assets, suspended Taylor's powers as trustee, appointed a receiver, Howard Reiner (Receiver), and issued injunctive relief prohibiting Taylor from interfering with the trusts, assets, and entities at issue, and requiring him to provide an accounting for each of the trusts.

This appeal ensued.[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(1), (a)(4) (permitting immediate appeal of an interlocutory order appointing a receiver or granting a temporary injunction).

## II.     BACKGROUND

The events at issue span more than twenty years and encompass a labyrinthine and evolving family financial structure. The following provides a summation of the basic facts pertaining to the main issues in the lawsuit.

---

[5] On August 10, 2020, this Court issued an order (1) granting in part and denying in part "Appellants' Motion for Emergency Stay and To Remand the Trial Court's Order for Further Proceedings," and (2) directing appellees to file a response to that motion. On August 20, 2020, we issued an order stating that the partial emergency stay would remain in effect pending resolution of the appeal.

On September 10, 2020, this Court: (1) ordered "Appellees' Motion to Dismiss Appeal as to Suspension and Accounting Decrees" to be carried with the case; (2) denied "Appellants' Emergency Motion to Clarify or Amend Stay Order"; and (3) granted in part and denied in part appellees' "Emergency Motion to Require Bond and Emergency Motion to Advance." In ruling on appellees' emergency motion, we abated and remanded this appeal to the trial court for a full consideration of appellees' request for the appellants to provide security during the pendency of this appeal and to determine the appropriate amount of a bond. On November 12, 2020, the trial court ordered Taylor to file a $10,000,000 bond to suspend enforcement of the judgment. *See* TEX. R. APP. P. 24.1.

On March 2, 2021, we reinstated this appeal and informed the parties that appellants' brief was due on or before March 22, 2021. That same day, we ordered "Appellees' Motion to Act on the Findings and Recommendations" to be carried with the case. On March 11, 2021, this Court reviewed the trial court's order of November 12, 2020, and concluded that there was no abuse of discretion. *See id.* R. 24.4. We therefore granted "Appellees' Motion to Act on the Findings and Recommendations."

On June 24, 2021, we granted in part and denied in part "Appellees' Motion to Modify Stay Order In Light of Developments During 2021." Because appellees asserted that Taylor had not filed the bond and continued to mismanage and deplete trust assets, we again abated and remanded the case to the trial court to consider Taylor's failure to comply with the trial court's order and post a bond. The appeal has been abated since that time.

We now reinstate the appeal. The parties have not favored the Court with additional briefing regarding the events on remand, and so we address the merits as previously briefed. We address "Appellees' Motion to Dismiss Appeal as to Suspension and Accounting Decrees," which we previously carried with the case, in the body of the opinion.

6

## A.    Richard and Sylvia

The Bumstead family built an "empire" in the construction business and amassed substantial personal assets. Upon retirement, Richard and Sylvia moved to their family ranch in Huffman, Texas. On October 13, 1998, with the assistance of attorney Mulder,[6] Richard and Sylvia created several entities for the purposes of managing their assets.

First, Richard and Sylvia created the Bumstead Living Trust (Living Trust) for which they served as both settlors and trustees. They funded the Living Trust with, among other things, personal effects and personal property, the Hardy Road Property, and the Homestead. The instrument establishing the Living Trust was extensive and addressed numerous matters, including trust administration, the death of a settlor, and other resulting trusts, including the Survivor's Trust, the Exempt and Nonexempt Marital Trusts, and the Family Trust.

Second, Richard and Sylvia created the Bumstead Family Irrevocable Trust (Family Trust) for the benefit of their daughters and descendants. Richard and Sylvia served as settlors and Debra, Kathryn, and Carol were designated as trustees.

Third, Richard and Sylvia created Ridescka with an "Agreement of Limited Partnership." The agreement stated that Ridescka's general partners were Richard and Sylvia in their individual capacities, while Ridescka's limited partners were Richard and Sylvia as trustees of the Living Trust and their daughters as trustees of the Family Trust. Richard and Sylvia also executed an "Appointment of Standby General Partners" for

---

[6] Mulder was subsequently disbarred. His disbarment was not related to the events underlying this lawsuit.

Ridescka. Under the appointment: (1) if both Richard and Sylvia died, became incapacitated, or otherwise ceased to act as general partners of Ridescka, the beneficiaries were designated as Ridescka's general partners, and (2) if either Richard or Sylvia died, became incapacitated, or otherwise ceased to act as general partner, the general partner would be "the one of us who is living, not incapacitated, and desires to continue to act as [g]eneral [p]artner."

By separate warranty deeds, Richard and Sylvia conveyed to Ridescka: (1) a tract of approximately 439 acres of the Wolf Road Property (the Harris tract), and (2) a tract of approximately 999 acres of the Wolf Road Property (the Liberty tract). The transfer of realty to Ridescka excluded the Homestead. Kathryn testified that Ridescka is the "main family business."

In 2010, Richard and Sylvia formed Wolf Trot Properties, LLC to own and manage some of the Ridescka properties. As general partners of Ridescka, Richard and Sylvia transferred real property from Ridescka to Wolf Trot. By warranty deeds signed on February 27, 2010, Ridescka transferred approximately 200 acres of the Liberty tract to Wolf Trot Properties, LLC (Series A), and transferred approximately 252 acres of the Liberty tract to Wolf Trot Properties, LLC (Series B). By correction deeds, Richard and Sylvia clarified that the conveyances were limited to the surface estates and excluded mineral interests. Ridescka thus retained the mineral interests for both tracts.

On April 8, 2011, Richard and Sylvia executed a Restatement of the Living Trust.

8

**B.      Richard's Death**

On June 15, 2012, Richard passed away suddenly as a result of an accident on the family ranch. Upon his death, the Living Trust terminated other than for purposes of administration. Kathryn testified that the assets of the Living Trust were held in an administrative trust until the estate and probate matters were concluded, and the administrative trust was finalized approximately six months after her father's death.

Kathryn testified that when Richard passed away, Sylvia was receiving inpatient care at the Menninger Clinic for various health issues including depression. Kathryn stated that she had concerns about her mother's health that encompassed concerns about her decision-making, memory issues, and sleeping.

At this time, Kathryn had "a little bit of knowledge" about how her family's financial affairs were being handled. Before her father died, she knew that there were difficulties between her father and mother about her mother's spending choices. After her father passed away, Kathryn and her sisters saw "firsthand" that "the decisions that [Sylvia] was making didn't seem to make sense" and "didn't seem to be financially sound."

Following Richard's death, Sylvia executed an "Agreement Regarding Distribution of Bumstead Living Trust Assets" (distribution agreement) to transfer properties out of the Living Trust. Under the distribution agreement, Richard's share of the assets of the Living Trust passed to the Family Trust and Sylvia's share of the assets passed to the Survivor's Trust. Sylvia served as the trustee of both trusts and continued to serve as a general partner for Ridescka. The distribution agreement was retroactively effective as of the date of Richard's death. Under the distribution agreement, the Living Trust's 99.4 percent

9

limited partnership interest in Ridescka went to the Family Trust, while the Hardy Road Property, then valued at $1.7 million, and the Homestead went to the Survivor's Trust. At this time, the schedules attached to the distribution agreement indicated that many other assets were distributed to the Survivor's Trust, including several annuities, an airplane, a bank account, a home and lot located in Belleville MI, and several hundred thousand dollars in receivables from the Family Trust.

After Richard's death, Sylvia was in declining health, and Taylor began assisting her with the family's affairs. Kathryn testified that she knew that Taylor was "handling all the business" for her mother, and that "was [Sylvia's] decision."

On March 1, 2013, Sylvia established the TCM Trust for Taylor's benefit. Sylvia served as the settlor, and Taylor was designated as the trustee.

## C.    Hardy Road Property

The Hardy Road Property was commercial in nature and had been leased by New Acton Mobile Industries, LLC (Acton) since 2007. The lease, under which Ridescka served as the landlord, was signed by Richard as Ridescka's general manager, and Ridescka received the monthly rental payments. The rental payments were adjustable and comprised approximately $20,000 monthly in 2014. In 2019, the Hardy Road Property was appraised for $3,200,000 to $3,600,000.

On December 17, 2014, Taylor as trustee of the TCM Trust allegedly purchased the Hardy Road Property from the Living Trust. Neither Sylvia nor Taylor disclosed this transaction to the beneficiaries.

Taylor stated that Sylvia attempted to give him the Hardy Road Property, but he did not think an outright gift would "necessarily be fair to the rest of the family." Taylor testified that during his grandparents' lifetime, his grandparents commonly made gifts to family members. Kathryn acknowledged that, for instance, Sylvia spent substantial sums on Lindsay's equestrian pastime.

The December 17, 2014 transaction was not evidenced by a purchase and sale agreement. Taylor produced two different promissory notes that he alleged substantiated this transaction. Both promissory notes are dated December 14, 2014, and state that Taylor, as trustee of the TCM Trust, promised to make payments to Sylvia as "Sole Trustee of the Bumstead Living Trust dated October 13, 1998." Sylvia did not sign either note. Neither promissory note includes internally referenced deeds of trust. Both notes are self-canceling installment notes which terminate upon payment in full or Sylvia's death.

Mulder testified that he facilitated the transfer of the Hardy Road Property to Taylor's trust. He prepared the promissory note and deed. He testified that the promissory note contemplated payments that approximated the lease payments that were being made on the property. He indicated that Sylvia wished to transfer the property but retain the income during her lifetime.

The first promissory note recites a purchase price of $1,387,425.00 and an interest rate of fifteen percent, and states that payments are due by the tenth of each month beginning on January 15, 2015. This note states that it is payable in equal monthly installments of principal and interest in the amount of $22,384.02 or more. The unpaid

balance was due and payable on or before the earlier of December 17, 2024, or Sylvia's death. The "note and any underlying obligation to pay shall be cancelled and terminated as if paid in full upon the death of [Sylvia]." This note does not include Taylor's signature.

The second promissory note, which was provided to the beneficiaries after Sylvia's death, differs from the first in several ways. The second recites a purchase price of $1,700,000.00, rather than $1,387,425.00; includes monthly installments of $21,352.00 or more, rather than $22,384.02; has a due date of the fifteenth of the month rather than the tenth; and is signed by Taylor as trustee, whereas the first promissory note was unsigned.

Mulder stated that he represented Sylvia in this transaction. He drafted the promissory notes but testified that he could not recall why there were two different versions. When asked why there were two versions of the note, Davis stated that Mulder's files were provided to him in a haphazard fashion because Mulder's law practice was winding down at that time. Davis further testified that using a promissory note for the transaction avoided the necessity for Sylvia to file a gift tax return and use a portion of her available gift and estate tax exemption.

On December 17, 2014, Sylvia signed a warranty deed transferring the property to the TCM Trust in her capacity as "Successor Sole Trustee of the Richard C. Bumstead Trust." However, in 1998, Richard had amended the Richard C. Bumstead Trust to rename it as the Bumstead Living Trust, and he thereafter transferred the Hardy Road Property to the Living Trust. And, at this point in 2014, the Living Trust had terminated due to Richard's death (other than for administrative matters), and the assets of the

12

Bumstead Living Trust had been distributed to the Survivor's Trust and the Family Trust. The Hardy Road Property was then held by the Survivor's Trust.

The 2014 warranty deed transferring the Hardy Road Property to the TCM Trust was not filed in the Harris County public records until 2018.

Taylor did not make a down payment on the Hardy Road Property. According to Taylor, he made the monthly installment payments for the Hardy Road Property that he was required to make under the promissory note by forwarding the rental payments made by Acton. Thus, when the rental payment fluctuated in value, his monthly payments fluctuated accordingly and did not necessarily match the stated amount of the installment payments as provided by the promissory note. Taylor testified that he always paid more than was due under the promissory note. He paid these amounts to Ridescka. Taylor asserted that he paid approximately $130,000 in excess of the $21,352 owed per month and made roughly a million dollars' worth of payments from January 2015 until April 2019.

In 2016, Taylor renegotiated the Acton lease on the Hardy Road Property, and on February 29, 2016, he executed a new lease agreement. Taylor testified that the proper party to the lease was the TCM Trust, but he nevertheless signed the lease on behalf of Ridescka. He explained this as follows:

> Yeah, it was just—the attorneys that were helping me with the lease at the time. Acton was really pushing to get the amendment done and I had asked the attorney, I told him about my Trust owning it and should we clean that up on behalf [of] TCM Trust[,] and they felt it was going to be too much paperwork and it would bog me down[.] [S]o we did it that way, to mirror the original lease.

In 2019, the beneficiaries discovered that Sylvia had allegedly conveyed the Hardy Road Property to Taylor's TCM Trust. At that time, Sylvia was in failing health, and

13

Kathryn was visiting her at the ranch. Kathryn saw a tax document regarding the Hardy Road Property which indicated that it was owned by the TCM Trust. Kathryn asked Sylvia about it, and they discussed it with Taylor and the other beneficiaries. According to Kathryn, "Taylor said that [Sylvia] had agreed to give him that property and that he didn't think that was fair[,] so he agreed to purchase it."

Subsequently, on March 2, 2019, Sylvia and Taylor exchanged the following text messages:

[Sylvia:]   Have I titled [a]ny property to anyone? Katy seems [t]o think I 'titled' hardy property to you[.] [I]f [I] did I don't recall it[.] Let [me] know please[.]

[Taylor:]   Yes[,] back in 2014[.]

[Sylvia:]   Katy is here and she asked me if I had done that[;] if I did[,] I surely don't remember[.] My memories are not always good[.] I've forgotten a lot and my memories are not always so good[.] [L]let me know please[,] []Grama[.]

[Taylor:]   Yes. You told . . . Mulder, . . . [me,] and Mickey that we couldn't say anything. We legally can't tell anyone. It has to come from you[.]

[Sylvia:]   When was this[?] I don't recall it at all[.]I I need to have the girls all in a phone call and get it [s]traighten[ed] out[.] I blame myself if I did anything like that[.] [T]hen I need to straighten it out and find out what the girls have in mind[.] I REALLY DON'T remember that and if I really did[,] I need to fix it fast[.] The girls have a hard enough time working together without me messing it up[,] So where do I start?

[Taylor:]   A meeting w/ Mickey.

[Sylvia:]   I will call him on Monday[.] By phone[,] thanks[.] I'll see if [I] can convince Katy to listen She was hurt more than mad[.] I don't blame her[.] What do you suggest?

[Taylor:]   We all need to go to see Mickey in [p]erson. It's just a fact. It

14

happened four years ago. I've been paying interest on the note for four[—]almost five[—]years now[,] amounting to almost $1mm[.] It wasn't given to me[,] it was loaned[.] I essentially purchased it[.]

[Sylvia:]    What do you mean you chased it [sic][?] Are you coming back so I can talk to you instead of texting?

[Taylor:]    Yes [I]'ll be back around 10[.]

The beneficiaries contacted Davis to let him know they were aware of the transaction. According to Davis, they had a meeting prior to Sylvia's death and discussed the self-canceling promissory note. Davis stated that the beneficiaries "were very upset perhaps not so much that the transaction occurred but that it was withheld from them and they didn't know about it and they felt like [Sylvia] and [Taylor] had not been forthcoming with them and . . . they were very upset by that."

Davis testified that he had met Sylvia in 2017, reviewed the estate planning performed by a previous attorney, and undertook additional estate planning on her behalf. Davis testified that he discussed the Hardy Road Property transaction with Sylvia to ensure that she had intended to undertake the transaction. "She confirmed that the Hardy Road [Property] transaction was a transaction that she intended to . . . enter into." He testified that she asked him not to disclose the transaction to the beneficiaries.

Mulder testified that Sylvia's 2014 tax return should have included the Hardy Road Property transaction as a capital transaction, but the return did not include that information. He further testified that Ridescka's 2014 tax return showed that Ridescka reported income from the Hardy Road Property.

15

**D.      2015 Changes**

Taylor graduated from Oklahoma State University with a bachelor's degree in business administration in 2015. At that time, he began residing with Sylvia at the Homestead. Sylvia was in ill health, and Taylor advised the beneficiaries that he would be assisting her with her business and financial affairs. During May of that year, Sylvia and Taylor made several problematic changes regarding the family's assets.

**1.      Management Services Agreement**

On May 1, 2015, Taylor signed a "Management Services Agreement." The agreement purports to be between the Living Trust, which was now defunct, and Taylor, who is described therein as "a [m]anagement consultant with experience in evaluating and providing investment opportunities and providing management of such investments to business[es], trusts[,] and individuals." Taylor signed this agreement both as "consultant" and as trustee of the Living Trust. At that point, however, Sylvia had not yet executed any documentation purporting to appoint Taylor as a trustee for that trust.

The management services agreement provided that Taylor would receive a fee of two percent of the fair market value of assets that he actively managed, plus twenty percent of an internal rate of return on assets that he actively managed. The two percent "is paid at least annually," and the twenty percent "is not paid out until [the Living Trust] has been paid principal plus return." When Taylor signed this agreement, he had not yet graduated from college and had not yet been employed as a consultant.

At the underlying hearings, Taylor testified that he had not been compensated for his work as a trustee. He asserted that he had actively managed the estate, maintained

16

the Homestead, successfully handled wetlands litigation pertaining to some of the property, and worked to establish a utility district to benefit the family's property. We note that in their pleadings, the beneficiaries alleged that Taylor had demanded $716,161.94 for four years of management service pursuant to this agreement.

## 2. Appointment as Trustee

On May 20, 2015, Sylvia and Taylor signed a "Designation of Co-Trustee Under Bumstead Living Trust." This document states:

> In accordance with Section 3.05[7] of the Bumstead Living Trust, I, Sylvia M. Bumstead, as current sole Trustee hereby appoints Taylor Moss as Co-Trustee for any and all purposes of the Bumstead Living Trust, the Survivor's Trust created under Article Eight and the Family Trust created under Article Eleven of the Bumstead Living Trust.

That same day, Sylvia signed a "Designation of Successor Trustee Under Bumstead Living Trust." This document provides:

> In accordance with Section 3.03(c) of the Bumstead Living Trust, I, Sylvia M. Bumstead, as surviving Settlor hereby appoint Taylor Moss as sole Successor Trustee for any and all purposes of the Bumstead Living Trust, the Survivor's Trust created under Article Eight and the Family Trust created under Article Eleven of the Bumstead Living Trust.
>
> This appointment shall take effect upon my death or incapacity.

---

[7] Section 3.05 of the Restated Living Trust states:

Any individual Trustee may appoint an individual or a corporate fiduciary as a Co[-]Trustee. A Co-Trustee so named will serve only as long as the Trustee who appointed such Co-Trustee (or, if such Co-Trustee was named by more than one Trustee acting together, by the last to serve of such Trustees) serves, and such Co-Trustee will not become a successor Trustee upon the death, resignation, or incapacity of the Trustee who appointed such Co-Trustee, unless so appointed under the terms of this agreement. Although such Co-Trustee may exercise all the powers of the appointing Trustee, the combined powers of such Co-Trustee and the appointing Trustee may not exceed the powers of the appointing Trustee alone. The Trustee appointing a Co-Trustee may revoke the appointment at any time with or without cause.

As stated previously, however, the Living Trust had terminated. Further, section 3.03(c) of the Restated Bumstead Living Trust Agreement provides, in relevant part, that:

> Except for the Trustee of the Survivor's Trust, any Trustee appointed by the surviving Settlor to a trust of which the surviving Settlor is a beneficiary must be an individual or corporate fiduciary that is not related or subordinate to the surviving Settlor within the meaning of [§] 672(c) of the Internal Revenue Code.

Thus, under the terms of the Living Trust, if it were extant, Taylor was not eligible for these appointments. *See* 26 U.S.C.A. § 672(c)(2) (stating that a "related or subordinate party" to a grantor includes the grantor's "issue"); *Issue*, BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "issue" as "lineal descendants; offspring").

Kathryn testified that the trustees of the Living Trust, the Survivor's Trust, and the Family Trust were always the three beneficiaries and that they were never removed as trustees.

### 3. Ridescka & Wolf Trot

On May 20, 2015, Sylvia filed a "Certificate of Amendment" to the Ridescka partnership agreement. Under the original Agreement of Limited Partnership, Ridescka's registered agent was Richard, and the general partners were Richard and Sylvia "and any successor General Partner(s) pursuant to the terms of this Agreement." The Certificate of Amendment instead states that the registered agent and general partner for Ridescka is Wolf Trot Properties, LLC. The Certificate of Amendment is inconsistent with the Agreement of Limited Partnership, which provides that only an existing limited partner may be appointed as a general partner.

On May 20, 2015, Sylvia also signed a "Unanimous Written Consent of the Members to Act Without Meeting." It states that all the "members" of Wolf Trot who were entitled to vote had consented to adopting resolutions "memorializing and evidencing action previously taken on and as of the date indicated below." According to the resolutions, Wolf Trot was appointed as general partner for Ridescka, and Taylor was appointed as manager of Wolf Trot "to act on behalf of this LLC to have full power and authority without written consent of [Sylvia]."

However, Taylor's appointment as manager of Wolf Trot was not consistent with Wolf Trot's Certificate of Formation. Pursuant to its Certificate of Formation, Wolf Trot "will not commence business until it has received for the issuance of its certificates of membership interest consideration consisting of money, labor done, a promissory note or property received." Further, "[e]ach percentage of membership interest has one (1) vote on each matter on which the membership interest is entitled to vote." The certificate further provided that Wolf Trot "shall be managed" by a manager or managers, and designated Richard as its manager "until the first annual meeting of the Members or until successors are elected and qualified." The certificate stated that "[t]he powers to alter, amend or repeal the Company Agreement or adopt a new Company Agreement is vested in the Manager(s), subject to repeal or change by action of the Members." The certificate further provided:

> With respect to any matter, other than the election of the Manager(s), for which the affirmative vote of the holders of a specified portion of the membership Interest entitled to vote is required by the Texas Business Organizations Code, and notwithstanding that such Code may require a portion of the membership interest entitled to vote that exceeds that specified in this Article, the act of the Members on that matter shall be the

19

affirmative vote of the holders of a majority of the membership interest entitled to vote on that matter, rather than the affirmative vote otherwise required by the Texas Business Organizations Code.

Thus, the certificate provides that a manager is elected by the holders of the membership interest, and the holder of the membership interest was Ridescka.

The amendment to Ridescka and the resolutions enacted for Wolf Trot are similarly inconsistent with the several of the Texas Franchise Tax Public Information Reports filed for these entities. The reports for Wolf Trot dated November 16, 2015 and November 14, 2016, identify Carol as Wolf Trot's manager and Sylvia as Wolf Trot's manager and member. The report for Ridescka dated November 14, 2016, identifies Richard, who was then deceased, as Ridescka's agent and identifies Sylvia as Ridescka's general partner. The report for Ridescka dated April 26, 2019, continues to identify Richard as Ridescka's agent and identifies Taylor as Ridescka's "Director."

Taylor asserted that because he is the manager of Wolf Trot, and Wolf Trot is the general partner or a member of Ridescka, he is also a manager of Ridescka. Kathryn acknowledged that Taylor represents that he is the general partner or managing partner of Ridescka, but she knew of no authority for this. Kathryn asserted that none of the limited or general partners of Ridescka have authorized Taylor or Wolf Trot to act on Ridescka's behalf. Kathryn clarified that Wolf Trot is not a partner or member of Ridescka and Ridescka is instead an owner of Wolf Trot. She has never consented to Taylor or Wolf Trot acting as a general partner of Ridescka. As Kathryn testified, under the governing documentation, the daughters were the successor general partners of Ridescka.

20

Kathryn testified that the Family Trust owned Ridescka as of June 15, 2012. Kathryn testified that until her mother's death, her mother owned the majority of Ridescka through the Family Trust, but that trust terminated on her death. Under the terms of the Family Trust, after the death of the surviving settlor, Sylvia, its assets were to go to the Exempt Trusts established for the daughters. Kathryn thus testified that she and her sisters own Ridescka through the various trusts. Kathryn testified that she was never notified of any change in ownership of Ridescka.

Kathryn testified that the basic asset that the beneficiaries have requested Taylor to distribute is 99.4% of Ridescka. They wish for him to distribute this asset because it is the main owner of the properties that are held by the trust. For instance, Ridescka owns the ranch (the approximately 1,300 acres of the Wolf Road Property, excluding the Homestead).

### E.    Other Events Preceding Sylvia's Death

In 2016, Sylvia moved away from the ranch and into an assisted living home near Kathryn. In November or December of that year, Sylvia discontinued treatment for melanoma. During this period, Kathryn had a "little bit" of knowledge about her mother's financial matters. She knew that Taylor was "handling all the business" for Sylvia but said that "was [Sylvia's] decision." When Sylvia was in assisted living, Kathryn helped her with errands and paid for miscellaneous expenses, such as haircuts, from her mother's Chase Bank account where her social security check was deposited.

Kathryn is aware that Taylor claimed to be a co-trustee with her mother of the family trust. As far as she was aware, Taylor was paying for the assisted living apartment,

but was not paying for her mother's other expenses. Kathryn testified that some of her mother's medical bills were not paid "for a long time." Kathryn testified that during her mother's lifetime, Taylor made quarterly financial reports to the beneficiaries, but did not provide bank statements or credit card statements.

In 2016, Mulder stopped providing legal assistance to Sylvia and Taylor. In approximately 2017, Sylvia retained Davis to assist her with estate planning and retained new accountants. Davis testified that he met with Sylvia, reviewed the estate planning performed by Mulder, and undertook additional estate planning on her behalf. Davis testified that Sylvia's estate plan essentially provided for an even division of the assets that Sylvia owned at the time of her death between her three daughters.

On March 2, 2019, Sylvia executed an authorization allowing Davis "to discuss and extend attorney client privilege" to Taylor and her daughters "giving full and total access to all estate related matters." The authorization provides that "[f]ull and total access includes, but [is] not limited to, written, electronic, oral, data, statements, [and] any and all other forms of communication." That same day, she executed a similar authorization to Prather & Prather LLP.

On March 6, 2019, shortly before her death, Sylvia revoked the Survivor's Trust and created the Sylvia M. Bumstead Revocable Trust (Revocable Trust). She named Taylor as trustee of that trust. She also executed a new will. Sylvia's new will states that Taylor is the independent executor. Under the new will, the net assets of her estate were to be distributed to the acting trustee of her Revocable Trust.

22

**F. Sylvia's Death**

Sylvia died on April 9, 2019. Upon Sylvia's death, the Revocable Trust and the Family Trust terminated. Under their terms, the assets for the Revocable Trust were intended to flow into the daughters' Descendant's Trusts, and the assets for the Family Trust were intended to flow into the daughters' Exempt Trusts. Kathryn testified that the daughters are effectively the beneficiaries of all trust assets. Kathryn testified that Taylor had not moved the assets from the Family Trust to the Exempt Trusts. Thus, the individual Exempt Trusts had not been funded. Kathryn testified that they asked Taylor to wind down the Family Trust and distribute its assets; however, Taylor refused to do so without a release of liability. Davis confirmed that Taylor had offered to move forward with the distribution of estate assets "if we could receive appropriate releases and indemnities to protect [Taylor] from personal . . . liability." The beneficiaries rejected this offer.

On June 14, 2019, and June 15, 2019, Carol, Debra, and Kathryn separately signed documents entitled "Appointment and Acceptance of Sole Trustee" in which they appointed themselves as sole trustees of their Exempt Trusts. At that same time, they executed documents entitled "Election and Acceptance of Sole Trustee" in which they elected to serve as sole trustees of their Descendant's Trusts.

**G. DeisoMoss & Taylor's Online Presence**

At the hearing held below, the trial court considered evidence and testimony regarding the website for DeisoMoss, LP. The website identifies Taylor as a "Founder, Investment Committee." It states that Taylor is the current Chairman and CEO of Wolf Trot Properties, and the majority shareholder of Instant Road Repair, a road repair

23

servicer for schools, state and federal governments, NASCAR, and other organizations worldwide.

The website states that DeisoMoss "is a full[-]service real estate development and investment firm," and that "[w]e specialize in mixed-use, retail, hotel, industrial, laboratory [sic], and new master plan community development." The "investments" available to view on the website include the Hardy Road Property, identified as "industrial," and Pinehurst, identified as a "master-planned community." According to the website:

> The Hardy Road Property is on a 14.95[-]acre lot strategically located minutes from Houston's international airport (KIAH), and lies along the heavily trafficked Hardy Toll Road. Neighboring properties are also industrial owned by Fortune 500 companies, including Exxon Mobile [sic]. Product types in the area include warehouses, distribution centers, and ground leases. DeisoMoss owns and leases the property to a leading mobile facility solutions company.
>
> . . . .
>
> Pinehurst will be a 2,500[-]acre master-planned community located in Huffman, TX. Pinehurst will have two dedicated thoroughfares leading to and from the Grand Parkway (SH 99), an elementary and high school, over 3,000 homes and over 750,000 Sq. Ft. of commercial development. DeisoMoss is joint venturing with a publicly traded, nationally recognized home builder to develop the residential portion. DeisoMoss will be the exclusive developer of all commercial land in Pinehurst.

At the hearing, Kathryn testified that the beneficiaries disputed that the Hardy Road Property had been validly conveyed to Taylor, and they had concerns that the property could be sold during the lawsuit. According to Kathryn, Ridescka owns the Hardy Road Property.

Kathryn identified Pinehurst as the family ranch in Huffman, Texas. She stated that the beneficiaries had not hired Taylor or DeisoMoss to develop the ranch. Kathryn

24

testified that the ranch was a "unique" asset given its size and location. She knows of no other property in the locale that is as sizeable as the ranch, and the ranch has main frontage on Wolf Road and expansions to the Grand Parkway. She was concerned that Taylor would commit to developing the property during the litigation.

At the hearing, when questioned about the DeisoMoss website, Taylor acknowledged that DeisoMoss did not own the Hardy Road Property. He initially testified that Pinehurst was "a golf course in Carolina as I believe." He ultimately agreed that Pinehurst referred to the 2,500-acre development in Huffman, Texas, and acknowledged that would encompass the lands owned by Ridescka in the Family Trust.

Taylor conceded that the website's statement that he was the chairman and CEO of Wolf Trot Properties, LLC was not true. Taylor further acknowledged that he is not the owner of Instant Road Repair and that entity was actually owned by Ridescka. Taylor acknowledged that the website states that DeisoMoss was joint venturing with "a publicly traded, nationally recognized home builder," but acknowledged that "[w]e do not have a contract with anybody currently." Taylor also acknowledged that they lacked a current contract to develop the commercial lands in Pinehurst.

The trial court also considered Taylor's social media profile. Taylor represented that he had been a "Principal at DeisoMoss" since March 2017 and a "[r]eal estate developer/capital partner." He asserted that his experience included serving since March 2017 as a "[p]rincipal" at TCM Asset Management, LLC, described as "Family [O]ffice Investing." He also self-identified as a "[m]anaging [m]ember of Melia Investments," LLC since March 2016, and noted that he was an "[e]quity partner with Michael Dell's MSD

25

Capital and CGI Merchant Group in 1100 Biscayne Blvd. Miami, Florida property," which he identified as a "mixed use development." He further represented that since May 2015, he was a managing member of Wolf Trot Properties, noted as a "1,500 [acre] master plan community." Taylor also asserted that since 2015, he had been a "[g]eneral [p]artner" at International Roadway Research; however, in contrast, a 2015 tax return states that Ridescka owns International Roadway Research.

## H.  Accounting

Kathryn testified that the information that Taylor provided the beneficiaries during their mother's lifetime was not comprehensive and it was concerning. They were not provided with bank statements or financial records pertaining to Ridescka, for example. According to Kathryn, they now know that Taylor charged his personal expenses to Ridescka. Kathryn testified that she has not seen Ridescka's books and records and has only seen some financial accountings of its expenditures, and this causes her concern. Now, as one of the general partners of Ridescka, she wants to see a general accounting of its income and expenses. She estimated that overall, she only has approximately sixty percent of the required data.

Prior to filing suit, the beneficiaries requested Taylor to provide information regarding the financial status of the family's assets. While Taylor provided some information, the beneficiaries were dissatisfied with his response. For instance, Kathryn testified that she cannot ascertain, based on what Taylor has provided, why $3.3 million in disbursements were made or under what authority Taylor made them.

On September 18, 2019, the beneficiaries, through counsel but before filing suit, made a formal demand for Taylor to provide an accounting under § 113.151 of the property code. *See* TEX. PROP. CODE ANN. § 113.151. Ultimately, Kathryn testified that the beneficiaries filed suit, in part, because they had no other way to obtain information regarding the family's assets.

Taylor testified that he relied on business professionals, such as attorneys and accountants, to keep the beneficiaries informed as necessary. He testified that he had quarterly meetings with the beneficiaries from 2015–2019 where they discussed cash flows, expenses, projections, etc. He conceded that he did not provide a balance or profit and loss sheet for the trusts or copies of bills or statements for the thirteen credit cards he utilized since his appointment.

## I.     Assets & Management

Kathryn testified that she is concerned about Taylor's asset management, and she is concerned that he will take actions to damage the trusts. He has refused to step down as trustee. As some examples substantiating the beneficiaries' concerns, Kathryn testified that there is a tax lien on the ranch (Wolf Road Property), and Taylor has not resolved it. The "Notice of Federal Tax Lien," dated May 1, 2019, is directed to Sylvia as taxpayer and includes past-due taxes for 2014, 2015, 2016, and 2017 of $78,729.33. In turn, Taylor testified that an accounting firm prepared the taxes, and he has sought abatement or forgiveness of penalties because they were caused by Sylvia's illness and death and the non-responsiveness of his tax preparer. Kathryn further testified that Taylor gave the

27

beneficiaries less than a day to decide how to handle a wetlands litigation issue that arose regarding the properties.

Kathryn testified that prior to her mother's death, the beneficiaries watched Taylor manage her assets, and they were aware that he was proceeding with inquiries regarding how to best develop the ranch. Taylor has advised the beneficiaries that he seeks to develop the ranch through his partnership with DeisoMoss.

At the time of the hearing, the ranch consisted of approximately 1,300 acres of raw land currently leased to a rancher. Kathryn testified that the market value of the ranch was $5.8 million as of June 15, 2012, and in 2020, an appraisal indicated that the property was worth $12 million. She further testified that the property may increase in value when a highway is developed near the property. However, the beneficiaries have not agreed to allow Taylor or his companies to develop the ranch and they do not plan to do so. Kathryn testified that she has no confidence in Taylor's ability to develop the land.

Kathryn testified that Taylor currently resides at the Homestead. The beneficiaries have never authorized him to use it as his residence. They requested him to pay rent for his residence at the Homestead, and he refused. She testified that she has no access to the Homestead. According to Kathryn, Taylor pays someone approximately $3,000 each month to maintain the Homestead. She testified that Ridescka pays the bills for the Homestead and the ranch. Ridescka also pays for Taylor's personal expenses. Kathryn testified that she has reviewed credit card bills paid by Ridescka that include Taylor's food, travel, gym, and assorted other expenses.

Kathryn testified that Taylor purchased a life insurance policy for himself with a net death benefit of $3,085,000. He paid for the policy through Ridescka. Although Taylor argued that the insurance policy benefited Ridescka, Kathryn testified that she was concerned that his designation of the beneficiary could change, or that Taylor could borrow against the net cash surrender value.

Appellants contend, in contrast, that Taylor is an experienced real estate developer who has participated in successfully developing commercial realty, including the Woodson's Reserve and Aliana Shopping Center. Taylor testified that he maintained the family's real property and its resources, and his efforts increased the value of the family's assets. He further pointed to the increased appraisal amounts for the family properties after his duration as trustee. For instance, Wolf Road increased in value from $5.5 million to $12 million. As another example, Taylor testified that Acton leased a separate lot on the ranch property. He negotiated the lease and cleared the property for Acton but did not charge the estate for his work in order to enable the lease. He handled the wetlands litigation and worked to establish a utility district to benefit the estate. Appellants further argue that Taylor's management has resulted in increased cash assets held by Ridescka and the Living Trust.

### III.    JURISDICTION

As an initial matter, we address our jurisdiction over two different elements of this appeal. After this appeal ensued, the appellees filed a "Motion to Dismiss Appeal as to Suspension and Accounting Decrees." In summary, the appellees argue that the provisions of the trial court's July 20, 2020 order which suspend Taylor as trustee for the

29

trusts and which order him to provide accountings are unappealable interlocutory orders over which we lack jurisdiction. The appellants filed a response to appellees' motion to dismiss urging that our jurisdiction stems, in relevant part, from Texas Civil Practice and Remedies Code § 51.014(a)(1), providing for an appeal from an order appointing a receiver, and from § 51.014(a)(4), providing that a party may appeal from an interlocutory order that grants a temporary injunction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(1), (4). We ordered appellees' motion to dismiss to be carried with the case because the issues that appellees raised regarding jurisdiction were inextricably interwoven with the merits of appellants' appeal. The parties subsequently provided the Court with additional arguments regarding our appellate jurisdiction in their briefs. We now address these jurisdictional issues.

In *Bally Total Fitness Corp. v. Jackson*, the Texas Supreme Court held that § 51.014 should be strictly construed as a narrow exception to the general rule that only final judgments and orders are appealable. 53 S.W.3d 352, 352 (Tex. 2001) (internal quotation omitted); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012); *City of Houston v. Estate of Jones*, 388 S.W.3d 663, 666 (Tex. 2012). However, the supreme court recently acknowledged the growing prevalence of interlocutory appeals and clarified our standard of review for such appeals. *See Dall. Symphony Ass'n, Inc. v. Reyes*, 571 S.W.3d 753, 758 (Tex. 2019) (stating that the tenet that typically only final judgments and orders are appealable "may have been the general rule once upon a time"). Specifically, the supreme court stated that that "[l]imiting appeals to final judgments can no longer be said to be the general rule." *Id.* And, rather than applying a strict

30

construction of statutes authorizing interlocutory appeals, the supreme court held that "the real goal is simply a 'fair' reading of the [statutory] language." *Id.* (quotation omitted).

Appellees first assert that we lack jurisdiction over that part of the trial court's order which suspends Taylor's powers as trustee. In support of this assertion, appellees cite *Vranac v. Huddleston*, No. 05-08-00982-CV, 2008 WL 3412229, at *1 (Tex. App.—Dallas Aug. 13, 2008, no pet.) (mem. op.) (per curiam), which held that "[n]othing in [§] 51.014 provides for an interlocutory appeal from an order that suspends a trustee under section 114.008 of the Texas Property Code." We conclude that *Vranac* is distinguishable from the case at hand and does not control our analysis here.

As a threshold matter, appellants do not raise any issue specifically attacking the trial court's rulings suspending Taylor as trustee. And, more significantly, the trial court's order necessarily suspends Taylor's powers as trustee because the trial court appointed a receiver to handle the trusts. In other words, Taylor's ability to serve as a trustee was obviated upon the appointment of a receiver, and an order appointing a receiver is subject to interlocutory review by statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(1). *Vranac* addresses only an order suspending a trustee and does not concern an order appointing a receiver. *See Vranac*, 2008 WL 3412229, at *1. Given the foregoing, and applying a fair reading of the statute, we reject appellees' contention that we lack jurisdiction over any part of the appeal pertaining to the suspension of Taylor's position as trustee. *See Dall. Symphony Ass'n, Inc.*, 571 S.W.3d at 758.

Appellees further assert that we lack jurisdiction to review the provision of the July 20, 2020 order which requires Taylor to provide them with accountings for the trusts under

31

Texas Property Code § 113.152. *See* TEX. PROP. CODE ANN. § 113.152. The portion of the order requiring Taylor to provide accountings for the trusts is encompassed in the section of the order granting appellees' request for a temporary injunction and ordering injunctive relief.

In *Del Valle Independent School District v. Lopez*, the Texas Supreme Court rejected the notion that "matters of form control the nature of the order itself—it is the character and function of an order that determine its classification." 845 S.W.2d 808, 809 (Tex. 1992); *see also In re Estate of Skinner*, 417 S.W.3d 639, 642 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "An injunction may be either prohibitive, forbidding particular conduct, or mandatory, requiring particular conduct." *In re C.D.E.*, 533 S.W.3d 367, 372 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see In re Estate of Skinner*, 417 S.W.3d at 642–43; *see also Qwest Commc'ns Corp.*, 24 S.W.3d at 336 (concluding that an order was an injunction when it "command[ed] Qwest to undertake certain monitoring and notice provisions when conducting certain boring operations").

"[P]ortions of an order can be injunctive in nature and, thus, final and appealable, while other provisions of the same order can be interlocutory and unreviewable because they do not resemble injunctive relief." *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co.*, 540 S.W.3d 577, 587 (Tex. 2018); *see Leighton v. Rebeles*, 343 S.W.3d 270, 273 (Tex. App.—Dallas 2011, no pet.); *Easton v. Brasch*, 277 S.W.3d 558, 561 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 78 (Tex. App.—San Antonio 1996, no pet.); *Prodeco Expl., Inc. v. Ware*, 684 S.W.2d 199, 201 (Tex. App.—Houston [1st Dist.] 1984, no writ). To the extent the trial

court grants a temporary injunction as well as non-injunctive relief that is not appealable, § 51.014(a)(4) provides for an interlocutory appeal only from the part of the order granting the temporary injunction. *See Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 587–88; *Clark v. Clark*, No. 14-19-00604-CV, 2021 WL 5896101, at *5, __ S.W.3d __, __ (Tex. App.—Houston [14th Dist.] Dec. 14, 2021, no pet. h.).

We agree with the beneficiaries that an order on a request for accounting, standing alone, is generally not final and appealable. *See Pollard v. Pollard*, 316 S.W.3d 238, 241 (Tex. App.—Dallas 2010, no pet.); *see also In re Garcia*, No. 13-20-00233-CV, 2020 WL 5051508, at *1 (Tex. App.—Corpus Christi–Edinburg July 15, 2020, orig. proceeding) (mem. op.); *In re Jones*, No. 12-19-00354-CV, 2019 WL 7373848, at *8 (Tex. App.—Tyler Dec. 31, 2019, orig. proceeding) (mem. op.); *Estate of Easley*, No. 07-15-00378-CV, 2017 WL 764603, at *2 (Tex. App.—Amarillo Feb. 24, 2017, no pet.) (mem. op.). However, here, the order requiring an accounting is encompassed within the temporary injunction, which is itself subject to appeal, and the provision requiring Taylor to provide an accounting functions as a mandatory injunction because it orders him to engage in particular conduct. *See In re C.D.E.*, 533 S.W.3d at 372; *In re Estate of Skinner*, 417 S.W.3d at 642–43. Accordingly, under the circumstances present here, we have jurisdiction to review this directive. *See In re C.D.E.*, 533 S.W.3d at 372; *In re Estate of Skinner*, 417 S.W.3d at 642–43; *see Armstrong-Bledsoe v. Smith*, No. 2-03-323-CV, 2004 WL 362293, at *1 (Tex. App.—Fort Worth Feb. 26, 2004, no pet.) (mem. op.) ("This is an interlocutory appeal from a temporary injunction order issued by the probate court compelling an accounting from a trustee. The primary issue we address is whether the

temporary injunction is void for failure to include a bond amount and a trial setting."). We reject appellees' contention that we lack jurisdiction over any part of the appeal pertaining to the trial court's order requiring Taylor to furnish accountings for the trusts. *See Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 587–88; *In re C.D.E.*, 533 S.W.3d at 372; *In re Estate of Skinner*, 417 S.W.3d at 642–43.

After due consideration of "Appellees' Motion to Dismiss Appeal as to Suspension and Accounting Decrees," appellants' response thereto, and the additional briefing provided by the parties, we deny "Appellees' Motion to Dismiss Appeal as to Suspension and Accounting Decrees," and we proceed to address the merits.

## IV. TEMPORARY RELIEF

By their first issue, appellants assert that the trial court erred by "using mechanisms for temporary relief to disrupt the status quo and decide the merits of the underlying causes of action without due process." In support of this issue, appellants assert that: (1) the order initially purports to issue only temporary relief; (2) the mechanisms of temporary relief are designed to preserve the status quo and are misused when they disrupt the status quo; and (3) the order disrupts the status quo and reaches the merits without due process. They argue that ordering Taylor to transfer the Hardy Road Property to the Receiver for distribution disrupts the status quo in contravention of the law. They further argue that the order erroneously directs the Receiver to change the status quo by taking control of trust assets and affairs and directing the Receiver to distribute the trust assets upon application to the trial court. Finally, they assert that the order grants the "ultimate relief" requested by the beneficiaries insofar as the beneficiaries' live pleading had

34

requested that Taylor provide an accounting, that Taylor be removed as trustee, and that the court grant declaratory relief finding that Taylor breached his duties and the trusts have terminated. In this regard, appellants contend that the trial court's findings "sprawl beyond findings necessary to authorize a temporary injunction and cross the barrier against final adjudications." Appellants assert that the order improperly decides the merits without due process because, *inter alia*, Taylor did not receive sufficient notice that the claims would be tried on their merits, and he was denied the right to a jury trial.

In response, appellees argue that the trial court's pretrial use of the remedies found in Texas Property Code § 114.008 constitute a valid exercise of the court's discretion. They assert that a trial court has several discretionary remedies at its disposal in overseeing trust administration and trustee conduct, including receivers, temporary injunctions, and accounting and suspension of trustee powers. They argue that the interlocutory order dispenses "classic interim relief," as contemplated by the statute. Finally, they argue that the appellants' complaints about the process are unfounded. In connection with this assertion, they allege that the appellants minimize the key statutes and misunderstand the concept of status quo, and that the interlocutory order "no more decided the merits here than any temporary injunction order decides the merits."

A.     Applicable Law

In analyzing this issue, the parties direct us to two separate bodies of law: the appellants invoke and brief the law pertaining to temporary injunctions, and in contrast, the appellees urge us to apply statutory law provided by the probate code.

### 1. Temporary Injunctions

We review an order granting a temporary injunction under an abuse of discretion standard. *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (per curiam); *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017). The trial court does not abuse its discretion in resolving evidentiary matters "if some evidence reasonably supports the court's ruling." *Henry*, 520 S.W.3d at 34; *see Abbott*, 610 S.W.3d at 916. However, the trial court has no discretion to incorrectly analyze or apply the law. *Abbott*, 610 S.W.3d at 916–17; *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) (stating that "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion").

"The function of a preliminary injunction is to maintain the status quo rather than adjudicate the matter on the merits." *In re M-I L.L.C.*, 505 S.W.3d 569, 576 (Tex. 2016) (orig. proceeding); *see Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555–56 (Tex. 2016); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The Texas Supreme Court has long defined the "status quo" as the "last, actual, peaceable, non-contested status which preceded the pending controversy." *Clint Indep. Sch. Dist.*, 487 S.W.3d at 555; *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding); *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 589 (Tex. 1962) (per curiam); *Transp. Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 553 (Tex. 1953).

In reviewing an order granting a temporary injunction, we "limit the scope of our review to the validity of the order, without reviewing or deciding the underlying merits." *Henry*, 520 S.W.3d at 33–34; *Butnaru*, 84 S.W.3d at 204; *InterFirst Bank San Felipe v.*

*Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam); *Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, 531 S.W.3d 829, 838 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.); *see also Magellan Terminal Holdings, L.P. v. Vargas*, No. 13-19-00354-CV, 2021 WL 79351, at *2 (Tex. App.—Corpus Christi–Edinburg Jan. 7, 2021, no pet.) (mem. op.) (explaining that the purpose of a temporary injunction "is to preserve the status quo of the litigation's subject matter pending a trial on the merits," it "may not be used to obtain an advance ruling on the merits," and the court "will decline to reach arguments as to the merits of the case").

**2.      Property Code**

The Texas Property Code permits injunctive relief to remedy a breach of trust. *See* TEX. PROP. CODE ANN. § 114.008. Section 114.008, entitled "Remedies for Breach of Trust," provides:

(a)     To remedy a breach of trust that has occurred or might occur, the court may:

(1)     compel the trustee to perform the trustee's duty or duties;

(2)     enjoin the trustee from committing a breach of trust;

(3)     compel the trustee to redress a breach of trust, including compelling the trustee to pay money or to restore property;

(4)     order a trustee to account;

(5)     appoint a receiver to take possession of the trust property and administer the trust;

(6)     suspend the trustee;

(7)     remove the trustee as provided under Section 113.082;

37

(8)    reduce or deny compensation to the trustee;

(9)    subject to Subsection (b), void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property of which the trustee wrongfully disposed and recover the property or the proceeds from the property; or

(10)    order any other appropriate relief.

(b)    Notwithstanding Subsection (a)(9), a person other than a beneficiary who, without knowledge that a trustee is exceeding or improperly exercising the trustee's powers, in good faith assists a trustee or in good faith and for value deals with a trustee is protected from liability as if the trustee had or properly exercised the power exercised by the trustee.

*Id.*; *see also Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, No. SA-17-CA-808-XR, 2017 WL 4051569, at *7 (W.D. Tex. Sept. 13, 2017).

## B.    Analysis

Appellants' issue asserts that the trial court erred in using mechanisms for temporary relief to disrupt the status quo and decide the merits of the underlying causes of action without due process.

### 1.    Status Quo

Appellants contend that the trial court's order disrupts the status quo insofar as it (1) orders Taylor to transfer the Hardy Road Property to the Receiver for distribution, and (2) directs the Receiver to take control of trust assets and affairs and to distribute the trust assets upon application to the trial court.

These assertions regarding the status quo involve the trial court's appointment of a receiver. The civil practice and remedies code authorizes an appeal from an interlocutory order that appoints a receiver. *See* TEX. CIV. PRAC. & REM. CODE ANN.

38

§ 51.014(a)(1). We review the appointment of a receiver under an abuse of discretion standard. *See In re Estate of Hallmark*, 629 S.W.3d 433, 437 (Tex. App.—Eastland 2020, no pet.); *Estate of Hoskins*, 501 S.W.3d 295, 305 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.); *Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.); *Benefield v. State*, 266 S.W.3d 25, 31 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The burden to show the existence of circumstances justifying the appointment of a receiver rests on the party seeking the appointment. *Estate of Hoskins*, 501 S.W.3d at 306; *Spiritas*, 459 S.W.3d at 232; *Elliott v. Weatherman*, 396 S.W.3d 224, 230 (Tex. App.—Austin 2013, no pet.); *Benefield*, 266 S.W.3d at 32. Further, "[r]eceivership is an extraordinarily harsh remedy and one that courts are particularly loathe to utilize." *Spiritas*, 459 S.W.3d at 232 (quoting *Hillwood Inv. Props. III, Ltd. v. Radical Mavericks Mgmt., LLC*, No. 05-11-01470-CV, 2014 WL 4294968, at *3 (Tex. App.—Dallas Aug. 21, 2014, no pet.) (mem. op.)); *see In re Estate of Hallmark*, 629 S.W.3d at 437. Even if a specific statutory provision authorizes a receivership, a trial court should not appoint a receiver if another remedy exists, either legal or equitable. *In re Estate of Hallmark*, 629 S.W.3d at 437; *Benefield*, 266 S.W.3d at 31. "Rather, receivership is warranted only if the evidence shows a threat of serious injury to the applicant." *Benefield*, 266 S.W.3d at 31; *see In re Estate of Hallmark*, 629 S.W.3d at 437.

The trial court may appoint a receiver, as relevant to this case, "in an action between partners or others jointly owning or interested in any property or fund." TEX. CIV. PRAC. & REM. CODE ANN. § 64.001(a)(3). In such a case, the applicant "must have a probable interest in or right to the property or fund, and the property or fund must be in

39

danger of being lost, removed, or materially injured." *Id.* § 64.001(b). The Texas Property Code also provides that where a breach of trust "has occurred or might occur," the trial court may "appoint a receiver to take possession of the trust property and administer the trust." TEX. PROP. CODE ANN. § 114.008(a)(5); *see Estate of Hoskins*, 501 S.W.3d at 306. "Subject to the control of the court," a receiver's general powers and duties include the ability to: "(1) take charge and keep possession of the property; (2) receive rents; (3) collect and compromise demands; (4) make transfers; and (5) perform other acts in regard to the property as authorized by the court." TEX. CIV. PRAC. & REM. CODE ANN. § 64.031; *Estate of Hoskins*, 501 S.W.3d at 306.

To the extent that appellants' contentions regarding the status quo concern the receiver's ability pursuant to the order to take control, possession, and custody of the receivership estate, we disagree with the premise of this argument. Appellants raise no issue on appeal regarding the appointment of a receiver, and a receiver is endowed with the power and duty to handle receivership property as previously stated. Further, it is clear that injunctive relief is available to preserve assets that are the subject matter of pending litigation and to secure an equitable remedy. *Nowak v. Los Patios Inv., Ltd.*, 898 S.W.2d. 9, 9–10 (Tex. App.—San Antonio 1995, no writ) (discussing cases where an injunction issued to preserve assets that would be subject to a pleaded equitable remedy such as rescission, constructive trust, or restitution); *see Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987); *see also Bates Energy Oil & Gas, LLC*, 2017 WL 4051569, at *7.

40

Nevertheless, we agree with appellants' argument, in part, that certain aspects of the order subject to appeal impermissibly alter the status quo. Specifically, the parties here dispute the ownership of multiple items of family property and income streams relative to those properties. Here, the order directs the Receiver to "Distribute the assets from the Bumstead Living Trust, the Bumstead Family Trust, the Survivor's Trust, and the Sylvia M. Bumstead Revocable Trust, upon application and future order of this Court." "[I]t is not the purpose of a temporary injunction to transfer property from one person to another, but rather to preserve the original status of the property pending a final decision on the rights of the parties." *Elliott v. Lewis*, 792 S.W.2d 853, 854 (Tex. App.—Dallas 1990, no writ) (vacating temporary injunction enforcing option agreement and ordering completion of sale of property); *see Getz v. Boston Sea Party of Hous., Inc.*, 573 S.W.2d 836, 837–38 (Tex. App.—Houston [1st Dist.] 1978, no writ); *see also Morgan Stern Realty Holdings, LLC v. Horizon El Portal, LLC*, No. 04-14-00208-CV, 2014 WL 2531980, at *2–3 (Tex. App.—San Antonio June 4, 2014, no pet.) (mem. op.) (concluding that a temporary injunction was a clear abuse of discretion where it "fails to merely preserve the status quo of the suit's subject matter pending trial on the merits, and instead permanently alters the status quo by ordering the transfer of Morgan Stern's interest to Horizon"). Accordingly, to the extent that the trial court's order envisions any change in ownership of trust assets by sale or distribution, the trial court erred.

## 2. Ultimate Relief

We next address appellants' contention that the order grants the "ultimate relief" requested by the beneficiaries insofar as the beneficiaries' live pleading had requested

41

that Taylor provide an accounting, that Taylor be removed as trustee, and declaratory relief finding that Taylor breached his duties and the trusts have terminated.

As a preliminary matter, this argument fails to consider the number and variety of the causes of action pleaded by the beneficiaries and the scope of the relief sought in the beneficiaries' live pleadings. The beneficiaries pleaded causes of action for common law fraud, statutory fraud, breach of fiduciary duty, negligence, undue influence, trespass to land, conversion, and money had and received. They requested the trial court to impose a constructive trust on the family properties and issue declaratory relief regarding the trusts, trustees, general and limited partners of Ridescka, and manager and members of Wolf Trot. The beneficiaries further sought economic and exemplary damages. Thus, palpably, the order does not grant the "ultimate relief" sought by the beneficiaries.

Fundamentally, appellants' argument fails to consider the nature of the relief sought by the beneficiaries. The beneficiaries sought temporary and interlocutory relief pursuant to the rules and law pertaining to temporary injunctions and § 114.008(a) of the Texas Property Code. The trial court's order parallels the relief sought. Further, the specificity of the trial court's order was necessitated by the rules and law pertaining to temporary injunctions. Rule 683 delineates the requirements for the form and scope of a temporary injunction and provides in relevant part that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." TEX. R. CIV. P. 683; *see RCI Ent. (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 603 (Tex. App.—San

42

Antonio 2012, no pet.). "[The] requirements of Rule 683 are mandatory and must be strictly followed." *Qwest Commc'ns Corp. v. AT& T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam) (citing *InterFirst Bank San Felipe, N.A.*, 715 S.W.2d at 641); *Grounds v. First GroundRock Royalties, LLC*, 629 S.W.3d 674, 676 (Tex. App.—San Antonio 2021, no pet.).

We reject appellants' contention that the trial court's order impermissibly reaches the merits or provides the ultimate relief sought in the underlying lawsuit.

### 3. Due Process

Appellants argue that the order improperly decides the ultimate merits without "their due process rights to sufficient notice and the jury" that appellants demanded. According to appellants, "[t]he process for the hearing on temporary relief lacked the procedural safeguards and notice requirements of a trial, the illumination of full discovery, and the clarity available through rulings on pending summary judgment motions regarding an exculpatory clause and conveyance of the Hardy Road Property." We have already rejected appellants' contention that the trial court impermissibly reached the merits of the case, and thus this argument necessarily fails.

Further, as stated previously, temporary injunctive relief preserves the status quo and does not involve the merits of the case. *See Butnaru*, 84 S.W.3d at 204; *Davis v. Huey*, 571 S.W.2d 859, 861 (Tex. 1978). Because a temporary injunction does not involve the merits of a case, appellants were not entitled to a jury trial. *See Miller v. Stout*, 706 S.W.2d 785, 787 (Tex. App.—San Antonio 1986, no writ); *Loomis Int'l, Inc. v. Rathburn*, 698 S.W.2d 465, 468 (Tex. App.–Corpus Christi–Edinburg 1985, no writ); *see also L.D.*

43

*Brinkman Inv. Corp. v. Brinkman*, No. 04-16-00651-CV, 2017 WL 1684836, at \*3–4 (Tex. App.—San Antonio Apr. 26, 2017, no pet.) (mem. op.) ("Our holding that the appellants were not entitled to a jury trial at the hearing on the temporary injunction is consistent with the applicable standard of review."); *Ross v. Sims*, No. 03-16-00179-CV, 2017 WL 672458, at \*7 (Tex. App.—Austin Feb. 15, 2017, no. pet.) (mem. op.) ("And, regardless of his demand for a jury trial, he was not entitled to one as to the application for a temporary injunction.").

Finally, appellants do not cite, and we do not find, any procedural deficiencies in the notice provided for the evidentiary hearing underlying the trial court's order. *See, e.g.*, TEX. R. CIV. P. 695 (governing the notice requirements for a receiver over "fixed and immovable" property). According to the clerk's record and the pleadings, the matter had been set for hearing on February 6, 2020, and then reset for February 21, 2020. At that point, appellants alleged that they had received inadequate notice of the hearing. The matter was ultimately reset. On April 23, 2020, the hearing was set for May 4, 2020, and it ensued on that date.

Based on the foregoing, we overrule appellants' contentions regarding due process and the right to a jury trial.

## C.    Conclusion

Appellants' first issue is sustained in part and overruled in part. We sustain this issue to the extent that the order provides that the Receiver can transfer title and distribute property at this stage of the litigation. Appellants' first issue is otherwise overruled.

44

## V. SUFFICIENCY OF THE EVIDENCE

In their second issue, appellants assert that the trial court erred "by relying on findings contradicted by conclusive evidence and supported by no evidence." In connection with this issue, they assert that the beneficiaries had the burden to provide evidence supporting the order but failed to do so. Appellants argue that "the findings and decrees about the Hardy Road Property are contradicted by conclusive evidence and supported by no evidence" because the evidence shows that Taylor owns that property. They further assert that the order "relies on disproven interpretations of financial transactions" such as tax filings and contend that the evidence showed that Taylor entered certain transactions for the benefit of the trusts rather than for his own personal benefit. Appellants also assert that the beneficiaries failed to show that temporary relief was necessary to prevent a probable, imminent, and irreparable harm before final adjudication. And finally, appellants assert that no evidence supports the finding that Taylor breached his duties.

In response, appellees argue that sufficient evidence supports the trial court's order. They assert that evidence shows that the Survivor's Trust owns the Hardy Road Property, but that, at a "minimum," the "evidence of Hardy Road Property's ownership is conflicting." They further argue that there is sufficient evidence that Taylor breached his duties as trustee because he failed to distribute the assets of the terminated trusts, failed to disclose material information about the trusts to appellees, failed to maintain trust assets separately and commingled trust assets with other assets, and generally, engaged in self-dealing and breached his fiduciary duties. Appellees assert that they met the

45

requisite elements for a temporary injunction, and the trial court was entitled to rely on the financial documentation provided by appellants.

## A.    Standard of Review

As stated previously, we assess the trial court's order under an abuse of discretion standard. *Henry*, 520 S.W.3d at 33; *Butnaru*, 84 S.W.3d at 2.04 (Tex. 2002); *Super Starr Int'l, LLC*, 531 S.W.3d at 838. A trial court does not abuse its discretion if some evidence reasonably supports its decision. *Henry*, 520 S.W.3d at 34; *Butnaru*, 84 S.W.3d at 211; *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 916 (Tex. App.—Dallas 2006, no pet.). We draw all legitimate inferences from the evidence in the light most favorable to the trial court's decision. *Marketshare Telecom L.L.C.*, 198 S.W.3d at 916; *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 489 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *see also Concerned Citizens of Palm Valley, Inc. v. City of Palm Valley*, No. 13-20-00006-CV, 2020 WL 4812641, at *2–3 (Tex. App.—Corpus Christi–Edinburg Aug. 13, 2020, no pet.) (mem. op.). Under this standard, the legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Super Starr Int'l, LLC*, 531 S.W.3d at 838; *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Proper Inv., LLC*, 481 S.W.3d 336, 343 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

## B.    Trustee's Duties

Certain formal relationships such as those between a trustee and a trust beneficiary give rise to fiduciary duties as a matter of law. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Zaidi v. Shah*, 502 S.W.3d 434, 442 (Tex. App.—

Houston [14th Dist.] 2016, pet. denied); *Bazan v. Munoz*, 444 S.W.3d 110, 118 (Tex. App.—San Antonio 2014, no pet.). In summary, a fiduciary "owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Ludlow v. DeBerry*, 959 S.W.2d 265, 279 (Tex. App.—Houston [14th Dist.] 1997, no writ); *see Jurgens v. Martin*, 631 S.W.3d 385, 409 (Tex. App.—Eastland 2021, no pet.); *Harrison v. Reiner*, 607 S.W.3d 450, 462 (Tex. App.—Houston [14th Dist.] 2020, pet. denied), *In re Estate of Miller*, 446 S.W.3d 445, 455 (Tex. App.—Tyler 2014, no pet.).

"High fiduciary standards are imposed upon trustees, who must handle trust property solely for the beneficiaries' benefit." *Ditta v. Conte*, 298 S.W.3d 187, 191 (Tex. 2009); *see Trostle v. Trostle*, 77 S.W.3d 908, 914 (Tex. App.—Amarillo 2002, no pet.) ("The duty of [a] trustee is to administer the . . . trust for the benefit of the beneficiaries."). The property code requires a trustee to administer a trust "in good faith" according to its terms and the applicable provisions of the property code, and in the absence of any contrary provisions, "the trustee shall perform all of the duties imposed on trustees by the common law." TEX. PROP. CODE ANN. § 113.051.

Trustees "owe beneficiaries 'a fiduciary duty of full disclosure of all material facts known to them that might affect [the beneficiaries'] rights.'" *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) (orig. proceeding) (quoting *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984)); *see* TEX. PROP. CODE ANN. § 113.151(a) (requiring a trustee to account to the beneficiaries for all trust transactions); *In re Alexander*, 580 S.W.3d 858, 868 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding). A fiduciary "has an affirmative duty to make a full and accurate confession of all his fiduciary activities,

47

transactions, profits, and mistakes." *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.—Tyler 2000, pet. denied) (citing *Montgomery*, 669 S.W.2d at 312–14; *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513–14 (Tex. 1942)); *see Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

"[T]he trustee's duty of loyalty prohibits him from using the advantage of his position to gain any benefit for himself at the expense of his trust and from placing himself in any position where his self-interest will or may conflict with his obligations as trustee." *Lesikar v. Rappeport*, 33 S.W.3d 282, 297 (Tex. App.—Texarkana 2000, pet. denied) (citing *Slay v. Burnett Tr.*, 187 S.W.2d 377, 388 (Tex. 1945)); *see also Musquiz v. Keesee*, No. 07-15-00461-CV, 2017 WL 4341463, at *5 (Tex. App.—Amarillo Sept. 28, 2017, pet. denied) (mem. op.). There is a presumption of unfairness regarding transactions between a fiduciary and a party to whom he owes a duty of disclosure, and thus the profiting fiduciary bears the burden of showing the fairness of the transactions. *See Tex. Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex. 1980); *Webre v. Black*, 458 S.W.3d 113, 118–19 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Cluck*, 401 S.W.3d at 114; *Lee v. Hasson*, 286 S.W.3d 1, 21 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The fiduciary must show proof of good faith and that the transaction was fair, honest, and equitable. *Webre*, 458 S.W.3d at 119; *Lee*, 286 S.W.3d at 21.

## C. Evidentiary Burden

Appellants assert, in essence, that the trial court's order is not supported by legally sufficient evidence. They argue that the record evidence shows that Taylor owns the

Hardy Road Property, that Taylor properly reported the "interest income" from his payments on the Hardy Road Property as attributed to Ridescka in tax filings, and that Taylor's expenditures, including those made to secure a life insurance policy, were for the benefit of the trusts and were not made for personal benefit. They further assert that "[n]o evidence supports the finding that [Taylor] breached his duties." According to appellants, the beneficiaries' "sole witness testified that she had no reason to believe [Taylor] violated any duty or made any misrepresentation." They argue that Taylor had no duty to disclose his purchase of the Hardy Road Property because he was not a trustee at the time of the conveyance. The appellants assert that Sylvia directed Taylor not to disclose the transaction, and Taylor cannot be held liable for Sylvia's acts or omissions.

## D.     Analysis

As a liminal matter, appellants do not attack all the trial court's findings made in support of the order. Leaving that matter aside, we conclude that the trial court did not abuse its discretion in issuing the order based on the evidence presented. The trial court concluded, among other things, that Taylor failed to comply with his duty to disclose material facts, failed to comply with his duties to maintain trust and entity assets separately and not to co-mingle the assets of the various trusts, either with his own property or with other trusts or entities, breached and/or may breach fiduciary duties, provided inadequate, incomplete, and/or inaccurate accountings, breached his duty of self-dealing, breached his duty to account, and breached his duty of loyalty. We briefly summarize some of the evidence supporting the trial court's order.

49

### 1. Fiduciary Duty, Good Faith, & Loyalty

Taylor testified that he is the trustee of the Living Trust, the Family Trust, the Survivor's Trust, and the Revocable Trust. He began serving as trustee in 2015. He acknowledged having a fiduciary duty to the beneficiaries of the trusts. He reiterated that he would not fund the Exempt Trusts for the beneficiaries without a waiver of liability.

Taylor acknowledged that the Family Trust terminated upon Sylvia's death and that it owned 99.4 percent of Ridescka as a limited partner. He agreed that he could have distributed the 99.4 percent interest in Ridescka to the beneficiaries but conceded that he failed to do so.

Taylor testified that he is "not intimately familiar" with the Survivor's Trust, but has a "general understanding" of it, even though he has purported to act as the trustee of that trust since May 2015. He could not recall what the assets were in the trust as of May 20, 2015, or what assets were currently held in that trust. To his understanding, the trust terminated at his grandmother's death, and he acknowledged he had not distributed its assets. Similarly, Taylor testified that he could not recall what assets are held in the Revocable Trust and could not name one asset that belongs to that trust. He further acknowledged that he did not know who owns the original "Series A" of Wolf Trot. He testified that when he made distributions from Ridescka, he did not pay proportional shares to the trusts, and could not recall what those proportional shares would be.

### 2. Self-Dealing and Personal Gain

Taylor testified that he paid for his personal expenses through Ridescka. He testified that this practice was not inappropriate because he "was practicing a precedent

that had been set for many, many years by [his] grandparents and [he] was continuing out of practice." He agreed, nevertheless, that he needed to comply with his fiduciary duties "regardless of what happened in the past."

Taylor agreed he was not supposed to use trust assets for his personal benefit "[o]ther than what was agreed upon with the beneficiaries" or a co-trustee. At the time of the hearing, Taylor resided at the Homestead. Taylor testified that he did not pay rent to live there, but instead provided "sweat equity" and assisted in maintaining the property.

Taylor created Melia Investments, LLC as a fifty-fifty partnership between the TCM Trust and a separate series of Wolf Trot named "Wolf Trot Properties, LLC and/or Ridescka." Taylor caused his TCM Trust to contribute $170,000 for a bridge loan, while Ridescka contributed approximately $880,000.

Taylor further used trust assets as part of marketing materials for his personal business, DeisoMoss. He affirmatively misrepresented the ownership and status of trust and estate assets on his website and on his LinkedIn profile.

### 3. Duty to Disclose

Taylor agreed that as a fiduciary, it is his obligation to keep the beneficiaries informed and that as a fiduciary and trustee, he had to act in the best interest of the beneficiaries. Taylor admitted he did not disclose the Hardy Road Property transaction but asserted he did not disclose that transaction at his grandmother's behest. Davis confirmed that Sylvia did not want her daughters to learn of the transaction.

Appellants assert that Taylor had no duty to disclose the transaction because he was not yet a trustee when the transaction allegedly took place in late 2014. However,

51

Taylor acknowledged he "intentionally" did not disclose the Hardy Road Property transaction from March 2015, when he was purportedly appointed as trustee, until 2019, when Kathryn discovered the transaction by accident. He further did not inform the beneficiaries that he claimed to be entitled to the rents being paid by Acton on the Hardy Road Property until March 2019. He "didn't necessarily hide it from [the beneficiaries]," but was "following the advice or request of [his] grandmother not to disclose it." He knew he was a fiduciary at that time. He understood that as a trustee he had an "affirmative obligation of disclosure" to the beneficiaries, and so he agreed that he "intentionally didn't meet that affirmative obligation of disclosure in 2016 as to the lease payments of Hardy Road." He further agreed that, in 2017 and 2018, he was intentionally not meeting his obligations of disclosure.

### 4. Comingling

As of the date of Taylor's alleged appointment as trustee, he knew that some or all the assets should have been assets of the Survivor's Trust and that none of the assets belonged to the Living Trust. However, Taylor did not segregate assets; instead, he left them as they were when he became trustee. He nevertheless acknowledged that as a trustee he had obligations to maintain the assets of trusts separate and apart from anyone else's funds. If there was a failure to separate, "it was done by my grandparents" and he "continued their practice." Regarding the allegations that he commingled trust assets, Taylor asserted that he "maintained the assets according to the precedent that was set by [his] grandparents." He stated that it "may not have been exactly what the Trust Agreements stipulate but there [were] many years of precedent that [he] adhered to."

52

Taylor testified that his grandparents paid personal and living expenses from the Ridescka checking account, and he continued that same practice because Sylvia indicated that was the way she wanted it done. For instance, Taylor testified that he paid expenses relating to the Survivor's Trust from Ridescka.

Taylor similarly made deposits without regard to asset ownership. Taylor testified that during a period spanning from 2015 to 2019, he placed funds into Ridescka and not the trusts. He deposited insurance policy benefits, paid after his grandmother's death, into the Living Trust bank account even though the Living Trust did not own it. He put the rental income from the Belleville, Michigan rental property into Ridescka, although he did not know whether Ridescka owned that property. Taylor deposited the $1,477,229.60 proceeds of an annuity in the Living Trust, although those proceeds actually belonged to the Survivor's Trust.

Taylor testified that the accounting professionals prepared and filed tax returns for the family entities. He could not recall what tax returns were filed for any of the trusts. He paid the Hardy Road Property income to Ridescka because that was the way it was done by his grandparents. So, Ridescka paid taxes on the Hardy Road Property rental income.

### 5. Conclusion

Based on the foregoing record evidence, we conclude that the trial court had before it sufficient evidence to issue the order subject to appeal. We reject appellants' contention otherwise.

53

**D. Probable, Imminent, and Irreparable Harm**

Appellants assert that the beneficiaries failed to show that temporary relief was necessary to prevent probable, imminent, and irreparable harm. The trial court's order concludes that the beneficiaries had demonstrated "a probable, imminent, and irreparable injury to the Living Trust, the Family Trust, the Survivor's Trust, and the Revocable Trust, Ridescka, and the Ridescka entities." Part III of the order is entitled "Findings Supporting Probable Right of Recovery and Probable Imminent and Irreparable Harm." It states that, "[i]f [Taylor] is not enjoined, [the beneficiaries] will face irreparable harm, because [Taylor] will, with reasonable certainty, continue to breach his fiduciary duties to [the beneficiaries] and the property and assets rightfully belonging to the Trusts and Entities will be lost, removed, or materially injured."

To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable imminent, and irreparable injury in the interim. *Abbott*, 610 S.W.3d at 916; *Butnaru*, 84 S.W.3d at 204.[8] "An injury is irreparable if the injured party

---

[8] Where injunctive relief is provided by a specific statute, an applicant may not need to prove these common law elements to obtain temporary relief. *See, e.g., Cook v. Tom Brown Ministries*, 385 S.W.3d 592, 599 (Tex. App.—El Paso 2012, pet. denied) (analyzing TEX. ELEC. CODE ANN. § 273.081); *8100 N. Freeway Ltd. v. City of Houston*, 329 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (analyzing TEX. LOC. GOV'T CODE ANN. § 243.010); *see also Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas 2009, no pet.). In such cases, we review the trial court's decision on a temporary injunction application for an abuse of discretion. *Hughs v. Dikeman*, 631 S.W.3d 362, 383 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *8100 N. Freeway Ltd.*, 329 S.W.3d at 861. However, not all statutory sources for temporary injunctions obviate the need to meet the common law requirements for injunctive relief. *See, e.g., Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 199 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (discussing when a statute will eliminate the need to meet the common law requirements to obtain a temporary injunction). The parties in this case appear to assume that the traditional common law elements are required under the statutory provisions at issue and have not separately addressed or briefed this issue. Accordingly, we assume, without deciding, that the common law elements are required in this case.

54

cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204; *see Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 311 (Tex. App.—San Antonio 2021, no pet.). Monetary damages may not adequately "compensate an injured party for the loss of property deemed to be legally 'unique' or irreplaceable." *N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see Burkholder v. Wilkins*, 504 S.W.3d 485, 491 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.). "The 'uniqueness' rule is most commonly applied when the disputed property involves real estate." *N. Cypress Med. Ctr. Operating Co.*, 296 S.W.3d at 175; *see Lavigne v. Holder*, 186 S.W.3d 625, 629 (Tex. App.—Fort Worth 2006, no pet.); *In re Stark*, 126 S.W.3d 635, 640 (Tex. App.—Beaumont 2004, orig. proceeding [mand. denied]). "Accordingly, it may be proper for a trial court to grant equitable relief when real property is at the heart of the dispute." *Danbill Partners, L.P. v. Sandoval*, 621 S.W.3d 738, 747 (Tex. App.—El Paso 2020, no pet.) (citing *Butnaru*, 84 S.W.3d at 211); *see Burkholder*, 504 S.W.3d at 491.

The assets at issue in this case include, but are not limited to, several different tracts of real property. One asset is the ranch, or the Wolf Road Property, which comprises approximately 1,300 acres. As stated previously, Kathryn testified that the ranch was a "unique" asset given its size and location. She knows of no other property in the locale that is as large, and the ranch has frontage on Wolf Road and expansions to the Grand Parkway. The property is expected to further appreciate in value. Taylor advertised the ranch as an investment opportunity on the DeisoMoss website and was

pursuing development plans for the ranch. Kathryn testified that she was concerned that Taylor would commit to developing the property without authority during the litigation. She also testified that there was a pending condemnation or eminent domain matter that affects the ranch, and she was concerned that Taylor would make commitments regarding that issue without the beneficiaries' authority. Further, Taylor claimed title to the Hardy Road Property. The parties dispute title to this asset, and it was also featured as an investment opportunity "owned" by DeisoMoss on its website.

We conclude that the trial court did not abuse its discretion in concluding that the beneficiaries had presented sufficient evidence showing that they would suffer an irreparable injury if the temporary injunction were not granted. *See Butnaru*, 84 S.W.3d at 204; *Danbill Partners, L.P.*, 621 S.W.3d at 747; *Burkholder*, 504 S.W.3d at 491; *N. Cypress Med. Ctr. Operating Co.*, 296 S.W.3d at 175.

## E.    Conclusion

We overrule appellants' second issue.

## VI.    ACCOUNTING

In their third issue, appellants assert that the trial court erred in ordering Taylor "to provide an accounting requiring information outside of [his] knowledge and funds outside of his control." In contrast, as discussed previously, appellees primarily argue that this aspect of the trial court's order is not final and appealable.

The provision at issue states:

[Taylor], as purported Trustee of the Trusts, shall on or before 30 days after the date of this Order, provide [the beneficiaries] with separate accountings for the Living Trust, the Survivor's Trust, and the Revocable Trusts, from the date of his purported appointment as Trustee of the Trusts that complies

56

with [§] 113.152 of the Texas Property (Trust) Code, identifying and explaining every act taken as purported Trustee of any of the Trusts related to property or assets belonging to the Trusts (the "Accounting"). As part of the Accounting, [Taylor] shall produce all supporting and/or source documents (including, but not limited to, front and back copies of cancelled checks, credit card statements, receipts, etc.) that explains and/or evidences each expenditure of the Trusts. As part of the Accounting, [Taylor] shall identify the allocations to principal and interest for any investment, loan, or transaction he entered into on behalf of the Trust.

## A. Applicable Law

The Texas Property Code allows a beneficiary to "request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later." TEX. PROP. CODE ANN. § 113.151; *see Estate of Hoskins*, 501 S.W.3d at 300. The property code further defines the requirements for a written statement of accounts as follows:

A written statement of accounts shall show:

(1)     all trust property that has come to the trustee's knowledge or into the trustee's possession and that has not been previously listed or inventoried as property of the trust;

(2)     a complete account of receipts, disbursements, and other transactions regarding the trust property for the period covered by the account, including their source and nature, with receipts of principal and income shown separately;

(3)     a listing of all property being administered, with an adequate description of each asset;

(4)     the cash balance on hand and the name and location of the depository where the balance is kept; and

(5)     all known liabilities owed by the trust.

TEX. PROP. CODE ANN. § 113.152; *see generally Tex. State Bank v. Amaro*, 87 S.W.3d 538, 543 (Tex. 2002).

57

**B.     Analysis**

Appellants assert that the accountings "should not require information or funds outside of [Taylor's] knowledge or control." The beneficiaries assert that appellants failed to preserve this issue for review because they did not object in the trial court on this basis. In the alternative, the beneficiaries assert that the order is "lawful" under the property code. They further argue that the order "does not require [Taylor] to do the impossible," and if Taylor "wishes to state in the written accounting[s] that he cannot get access to a particular document, he should just say that."

In reply, appellants argue that "parties may waive *issues*, not *arguments*." They cite *Montelongo v. Abrea*, 622 S.W.3d 290, 298 n.10 (Tex. 2021), in support of this contention. In terms of preservation, appellants assert that they "raised the issue that [Taylor] should not be required to account for the Settlors' actions and bookkeeping practices . . ., which encompasses the argument that one reason [Taylor] should not be required to account for acts by the Settlors is [Taylor's] lack of access to those records." In support of their contention that they preserved this alleged error, they cite to "Defendants' Objections to Plaintiffs' Proposed Order Granting Interim Relief," in which they asserted:

> [Beneficiaries] misstate [Taylor's] responsibilities. Under the Living Trust's exoneration clause, [Taylor], as a successor Trustee was not 'obligated to examine the accounts, records or actions of any previous Trustee . . ..' Further, [Taylor] as successor trustee is not liable for 'any act, omission or forbearance by any previous Trustee . . ..' As was conclusively established at the trial, [Taylor] continued the bookkeeping practices of his grandmother, [Sylvia]. Thus claiming [Taylor] failed in his fiduciary capacity because he failed to abide [by] duties he never had—and which had been waived by [the beneficiaries] via the practice of the Trust for years—is legally incorrect.

58

(Internal citations omitted).

In examining this issue, we conclude that appellants' reliance on *Montelongo* is misplaced. *Montelongo* concerns the issue of waiver as it pertains to issues and arguments raised in briefing. *See id.* at 297, 298 n.10. In that case, the supreme court noted that "our preservation rules recognize that parties may waive *issues*, not *arguments*, by failing to raise them." *Id.* (citing *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 885 (Tex. 2017)). The supreme court recently explored this doctrine in greater depth. *See Li v. Pemberton Park Cmty. Ass'n*, 631 S.W.3d 701, 704 (Tex. 2021) (per curiam). The supreme court explained it as follows:

> Appellate courts should "hesitate to turn away claims based on waiver or failure to preserve the issue." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017). This is especially so "where the party has clearly and timely registered its objection" to the ruling challenged on appeal. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 365 (Tex. 2014).
>
> This Court has 'often held that a party sufficiently preserves an issue for review by arguing the issue's substance, even if the party does not call the issue by name.' *St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214 (Tex. 2020). In the same vein, parties on appeal need not always 'rely on precisely the same case law or statutory subpart' on which they relied below. *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018). And while appellate courts 'do not consider issues that were not raised . . . below,' parties may 'construct new arguments in support of issues' that were raised. *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014).

*Li*, 631 S.W.3d at 704. Here, however, we are concerned with preservation of error at the trial court level by objection, not whether different arguments may be made to support certain issues at separate levels of appeal. Accordingly, *Montelongo* does not control our analysis, and we turn to the rules regarding preservation of error for appeal.

59

As a general rule, preservation of a complaint for appellate review requires (1) a "timely request, objection, or motion" that states "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) a ruling or a refusal to rule accompanied by an objection. TEX. R. APP. P. 33.1(a); *Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014). "The touchstone for whether an objection preserves an issue for appeal is whether the litigant timely and plainly made the trial court aware of its complaint and obtained a ruling." *Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 211 (Tex. 2021). To preserve error for our review, an appellant's complaint on appeal must comport with its objection in the trial court. *See Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 159–60 (Tex. App.—Austin 2017, pet. denied); *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 611–12 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

Here, appellants' complaint on appeal does not comport with the objection that they raised at trial. At trial, appellants objected that Taylor was not required to examine the accounts, records, or actions of a previous trustee, and that as a successor trustee, Taylor was not liable for any actions or omissions committed by a previous trustee, and thus any contention that Taylor breached a fiduciary duty on this basis was "legally incorrect." On appeal, appellants assert that the trial court's order requiring Taylor to provide accountings for the trusts encompasses records he has no access to and allegedly requires use of estate funds to which he has no access. Appellants' objection

to the trial court does not correspond to the argument made on appeal. Because appellants did not raise the argument in the trial court that they now raise on appeal, they have not preserved this issue for our review. *See* TEX. R. APP. P. 33.1(a); *Benson*, 536 S.W.3d at 895; *Elness Swenson Graham Architects, Inc.*, 520 S.W.3d at 159–60; *Katy Springs & Mfg., Inc.*, 476 S.W.3d at 611–12.

Further, even had appellants properly preserved this issue, their complaints would lack merit. Appellants argue that "[t]o the extent this decree requires [Taylor] to pay for accountants and account for acts on behalf of the Trusts by his Co-Trustee, [Sylvia], logistical problems prevent compliance." They assert that when Sylvia was the sole trustee of the trusts, she had credit cards issued for the trusts in her name. Appellants contend that "[Taylor] has never had access to these accounts, and since [Sylvia's] death, has not been able to access them." Appellants point to Taylor's testimony that he tried but failed to obtain access to credit card statements for thirteen credit cards utilized between the time of his appointment and the time of Sylvia's death. Appellants thus assert that the trial court's order "makes no carve[-]out for documents to which [Taylor] has actual access—rather, it states he must produce '*all* supporting and/or source documents.'"

If we are to understand Taylor's argument, it would appear that, acting as trustee, Taylor may have paid credit card bills without receiving or reviewing the credit card statements. We note that Taylor testified that he was unable to access the records for credit cards that were used by others but stated that he was "sure the majority of the expenses were out of Ridescka," thus he "was able to review the majority of the

61

expenses." According to Taylor, "[t]here may have been some ancillary expenses that [he] wasn't able to review but they were very small."

Leaving this issue aside, the trial court's order requires Taylor to provide an accounting for each trust "from the date of his purported appointment as Trustee of the Trusts . . . identifying and explaining every act taken as purported Trustee of any of the Trusts related to property or assets belonging to the Trusts." By its terms, the order does not encompass actions taken by Sylvia, and we reject appellants' contentions otherwise. *Cf. Corpus Christi Bank & Tr. v. Roberts*, 597 S.W.2d 752, 755 (Tex. 1980) ("We sympathize with the executor's difficulty in making a full accounting because of the death of this non-professional trustee as well as the death of his accountant before either could give testimony in this case. Nevertheless, this difficulty does not discharge the Trustee's obligation to make a full accounting of all funds belonging to the trust estate.").

Appellants also contend that the order requires Taylor "to pay for accountants" and encompasses "funds outside of [Taylor's] . . . control." In this regard, appellants argue that "the trial court has prevented [Taylor] from complying with this decree by transferring all the Trusts' funds into the registry of the court and refusing to rule on [Taylor's] applications for release of those funds to perform routine Trustee duties." They thus assert that "[t]his Court should modify this accounting decree so that it does not require inaccessible . . . funds." Appellants' arguments lack merit. The trial court's order does not require Taylor to hire an accountant to provide the accountings for the trusts, and the order affirmatively removes his duty to act as a trustee.

As trustee, Taylor was required to comply with the property code and provide accountings for the trusts that are compliant with the statutory requirements. We are confident that if Taylor lacks the statutorily required information, he can so inform the trial court and the omission can be resolved accordingly.

**C.     Summary**

Having reached the merits, we overrule appellants' third and final issue.

## VII.     CONCLUSION

We lift the stay that we previously imposed in this case. We affirm in part and reverse and remand in part. We reverse those portions of the trial court's July 20, 2020 order which allow the Receiver to transfer title to property where ownership of that property is disputed. We affirm the trial court's order as to all other matters.

GINA M. BENAVIDES
Justice

Delivered and filed on the
10th day of March, 2022.

63